HOUSTON LIGHTING AND POWER COMPANY, Appellant,

v.

Charles SUE, Appellee.

No. 2365cv.

Court of Appeals of Texas, Corpus Christi.

Nov. 4, 1982.

Rehearing Denied Nov. 29, 1982.

David M. Lacey, Stephen G. Tipps, Baker & Botts, Houston, for appellant.

Kenneth Strahan, Liberty, for appellee.

Before NYE, C.J., and YOUNG and GONZALEZ, JJ.

## OPINION

NYE, Chief Justice.

This is an appeal from a suit involving a trespass. Appellant-defendant is Houston Lighting & Power Company (HL & P), and plaintiff-appellee is Charles Sue. The case was tried to a jury on a claim of trespass with counts of negligence and gross negligence, based upon HL & P's conduct in not securing permission of the property owner or from the lessee Mr. Sue to enter onto the land.

The case was submitted to the jury which found: liability on the part of HL & P; actual damages associated with Mr. Sue's cattle business, including lost cows, costs of rounding up cows and other incidental costs in the amount of $25,346.85, and exemplary damages in the amount of $125,000.00 based on a finding to the effect that HL & P acted maliciously or in such a disregard of Mr. Sue's rights as to be the equivalent of malice. Judgment was entered on the verdict. On appeal, HL & P is complaining of certain evidentiary matters and additionally seeks a remittitur of the exemplary damages.

In 1971, Ebasco Services (one of the defendants, but not a party to this appeal) was hired as a contractor by HL & P to construct a cooling pond to be used in connection with an expansion of HL & P's Cedar Bayou power plant. Prior to that time, HL & P had acquired fee ownership of the land to be inundated by the pond. However, during the course of construction, it became necessary for HL & P to acquire additional land adjacent to that which it had previously purchased. Included in this adjoining land was a 12-acre portion of a 377-acre tract leased to Mr. Sue. This particular tract of land, specifically, the 12-acre tract, is the property on which the trespass occurred. Record title to this property was in Stokes Adair, Trustee. Although there was no lease of record, it was undisputed that appellee Mr. Sue was leasing this property from Stokes Adair for farming and grazing. The main dispute throughout the trial and here on appeal is whether or not HL & P had permission to enter onto this 377-acre tract of land.

HL & P contends that, in trying to acquire this land, Bill Thornton, the head of HL & P's Right-of-Way Department, contacted the office of Stokes Adair. An initial meeting was set up between Thornton (representing HL & P), Jim Schindler, Herbert Warren (one of Schindler's employees), and Robert Baumgarten, the general manager of Stokes Adair Company. At this meeting, HL & P's interest in purchasing 12 acres of the 377-acre tract was discussed; but the negotiations stalled when Schindler and Baumgarten took the position that HL & P should purchase the entire 377-acre tract instead of only 12 acres. Thornton testified that he was specifically advised by Schindler that if he was unavailable in the future, Thornton should deal directly with Warren (Schindler's employee).

Prior to renewed negotiations concerning the purchase of the tract of land, Ebasco (the general contractor) approached HL & P, requesting permission to construct a road across the 12-acre tract. Thornton then attempted to contact Schindler regarding the request to construct the road; however, he was not able to get in touch with him. Thornton then called Warren concerning the request. Warren initially told Thornton that he would have to get back to him after he consulted with Schindler. Warren later advised Thornton that a road could be built across the tract but that gates would have to be put on each end of the land since it was leased for grazing. Thornton did not ask, and Warren did not volunteer the name of the lessee, Mr. Sue. HL & P argues that the road was constructed after this permission was given, and therefore, no trespass occurred.

Appellee Sue contends, and the record bears him out, that he never did know that HL & P was using the land until July 7, 1972, when he first found out that some of his cattle were out of his pasture.

It is undisputed throughout the record that there was no permission given by Stokes Adair, the record owner of the land, or appellee Sue, the lessee of the land, for either HL & P or Ebasco, the contractor, to cross any part of the 377-acre tract of land.

HL & P, in its first point of error, contends that the trial court erred in excluding the testimony of Robert Baumgarten, which concerned Jim Schindler's partnership interest in the land in question, because it was admissible and crucial to HL & P's defense. HL & P argues that the focus of its defense in this trespass case was that it had obtained permission for Ebasco to go across the property and thus there was no trespass. HL & P claims that the testimony in support of this defense was that the permission came from a man acting on behalf of Schindler. Therefore, the exclusion of testimony concerning ownership of the land in question allowed appellee Sue to mislead the jury concerning Schindler's position and authority.

Appellant perfected a bill of exception on the excluded testimony. It was as follows:

"Q: What was the relationship between Stokes Adair and Jim Schindler?

A: Jim has an interest in the land. He is a partner with us in ownership of the land."

In reviewing the record, particularly Robert Baumgarten's deposition testimony, we find similar testimony was elicited from Mr. Baumgarten (the general manager for Stokes Adair). For instance, the following questions were propounded to Mr. Baumgarten:

"Q: Were you the individual for Stokes Adair that entered into this final agreement with Houston Lighting & Power in December of 1972, whenever it was?

A: Yes, Jim Schindler and I.

\* \* \* \* \* \*

Q: Would Jim Schindler have had the power or the authority to give Houston Lighting & Power permission to go upon that property?

A: Yes. Yes, he could have. I'm quite certain that he did not, because I would have known of it, I think, if he had."

We hold that if there was any error in excluding the testimony of Mr. Baumgarten as to Jim Schindler's relationship to Stokes Adair, it was harmless because such testimony was merely cumulative of previously

offered testimony. Rule 434, T.R.C.P. Any error in not admitting or excluding evidence becomes immaterial where such error does not affect the verdict and judgment rendered. To obtain reversal of the judgment for exclusion of evidence, appellants had the burden to show: first, that the rejection of the proffered testimony was error; and second, that it was reasonably calculated to and probably did cause the rendition of an improper judgment. *Franco v. Graham,* 470 S.W.2d 429 (Tex.Civ.App.—Corpus Christi 1971, aff'd as reformed on other grounds, 488 S.W.2d 390, 1972). *Schutz v. Southern Union Gas Company* 617 S.W.2d 299 (Tex.Civ.App.—Tyler 1981, no writ); *Crisp v. Parker,* 516 S.W.2d 10 (Tex. Civ.App.—Austin 1974, no writ). This, the appellant has not done. Accordingly, appellant's first point of error is overruled.

HL & P contends in its second point of error that the trial court erred in submitting Special Issue 18 (the exemplary damage issue) and in entering a judgment for exemplary damages because there is no evidence or insufficient evidence that the action of HL & P in telling Ebasco that it had secured permission for Ebasco to enter on the 377-acre tract was willful, fraudulent and malicious. In connection with this point, appellant also contends that the trial court erred in not granting a new trial or ordering a remittitur because the $125,000.00 award as exemplary damages is excessive.

It is well settled that a corporation, such as the appellant in this case, may be liable for exemplary damages. This liability can only arise by imputation of malice by some individual authorized to act for the corporation and who did, in fact, act as its agent. *P.C. Sorenson Co. v. Bell,* 326 S.W.2d 271 (Tex.Civ.App.—Dallas 1959, writ ref'd n.r.e.). See also: *Mayflower Investment Company v. Stephens,* 345 S.W.2d 786 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.). An award of exemplary damages is not justified if the only ground for such damages is that the act itself is unlawful. Instead, the act complained of must partake of a wanton and malicious nature. *Ware v. Paxton,* 359 S.W.2d 897 (Tex.1962).

To authorize a finding of exemplary damages for trespass, the evidence must show some element of fraud, malice or oppression. The act which constitutes the cause of action (in this case, the loss and damage to appellee Sue's cattle) must be actuated by or accompanied with some evil intent, or must be the result of gross negligence or such disregard of anyone's rights as is deemed equivalent to such intent. *Mayflower,* supra at 793.

In reviewing appellant's no-evidence point on the issue of exemplary damages, we are guided by the rule that in determining whether there is any evidence, we must consider only the evidence and the inferences tending to support the jury's finding and disregard all inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965). Here, there is an absence of direct evidence of the vital fact to be proved (appellant's willful and wanton conduct) but we find ample circumstantial evidence from other relevant facts and circumstances which were proved. *St. Joe Paper Company v. McNair Trucklease, Inc.,* 593 S.W.2d 818 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.); Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 359 (1960).

In reviewing the evidence in this case under the above previously stated facts and guidelines, we find the following additional facts to be pertinent. The evidence as to how Mr. Sue's cattle got out is relevant. Mr. Coonrod, an HL & P employee at the time in question, stated that a fence on the subject property was removed so Ebasco could drive onto the property and construct a road on which to haul the equipment and material. Ebasco testified that their principal job was to get the road built and that there was not any thought given to the cattle. A gap was built where the fence was, but the Ebasco employees stated that it was put up to keep "people from getting down there around our equipment." Mr. Coonrod was questioned on what care was taken to restrain the cattle, and he stated: "... And just like I say, we wasn't ever

concerned. Nobody told me nothing about to keep the cattle in to start with."

Mr. Jimmy Ray Daniels, who was paid by HL & P, testified that he was working on the Cedar Bayou Plant at the time in question when he saw the gap (fence) down. He stated that there were not any guards around while the fence was down and that the gap could not be seen from the gate. Mr. Daniels saw the cattle go through the part of the fence that was down. Mr. Coonrod testified as to the gap:

"Well, the gap we had down there, for a long time we kept it closed, too, then at the bottom, trying to keep the people out of there. And they kept cutting it down so much that we finally just quit putting it up, because this other one was locked up here, and very seldom they would ever cut this one up here. Because, you know, people was there in the dump area, and this oil company man, he is back and forth in there, too. So we just quit fooling with this gap and left this one locked."

Appellant also challenges this particular special issue and the judgment on an insufficient evidence basis. In reviewing an insufficiency point, we must consider all of the evidence to determine whether the jury findings are manifestly unjust. *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

It is undisputed that one day the cattle got out, the fence was down because a truck had backed into it. There is evidence in the record, however, that the gap was back in place later that afternoon.

Mr. Lawrence Burnett Horrigan, Jr., construction supervisor for Ebasco at the time in question, testified that he instructed his men that the gap was to be put up and locked every night. There was testimony in the record that there was a man at the front of the construction project to unlock the gate every morning.

The record in general reflects that the construction project for the Cedar Bayou Plant began in 1971. The negotiations for the acquisition of the additional land (the 377-acre tract) began in early 1971. This purchase was discussed at several meetings, the last of which took place in approximately June of 1971. During this June meeting, the need for expediency was conveyed by HL & P. After this meeting, Ebasco contacted HL & P about the need to build a road across the property in question. Mr. Thornton then called Stokes Adair's office and spoke with Mr. Warren, who allegedly gave him permission to cross the land. The record is not clear on this time period, but it appears to be within a 2–3 week period after the June 1971 meeting. It was not until July 1972, right after the cattle incident, that HL & P started purchase negotiations again.

We find, after a careful review of the entire record, that the award of exemplary damages is supported by some evidence in the record and that such evidence is not insufficient or against the great weight and preponderance of the evidence. HL & P, through its respective agents, knew that they were using a 12-acre portion of land to which they had no right-of-way. It chose to go onto the land after purchase negotiations broke down and to use the property anyway. It was not until after the plaintiff's cattle had escaped, or over one year, that HL & P tried to reestablish negotiations concerning the right-of-way. Furthermore, while using the land, the record shows that HL & P was consciously indifferent to the rights of Mr. Sue. Assuming for the moment that HL & P had received permission as they contend, HL & P admits that it was contingent on the construction of a gap because the land was leased for grazing. However, HL & P made no effort to find out who the lessee was; they ignored lessee's grazing rights and were indifferent about keeping the gap closed. The record is replete with testimony that HL & P and/or Ebasco were not concerned with keeping the cattle in, . . . only with keeping the people out. HL & P offered no explanation or justification for why the right-of-way negotiations (either as an easement or as an out-and-out purchase) were not diligently pursued until all 378 head of cattle escaped from the enclosed pasture. While

HL & P may have instructed the construction company to build gaps, the employees of both HL & P and Ebasco testified that these gaps were for keeping people out, and they were not concerned with the cattle.

The jury was entitled to conclude that HL & P made the business decision to go onto the land without permission and with conscious indifference to the rights of the lessee, Mr. Sue. Under HL & P's own theory of permission, they knew the land was leased for grazing but made no attempt to establish the identity of the lessee in order to secure his permission to enter the land. Therefore, we hold that there is a proper basis for exemplary damages in this case. See: *Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981); *Atlas Chemical Industries, Inc. v. Anderson,* 524 S.W.2d 681 (Tex.1975); *Louisiana Pacific Corp. v. Smith,* 553 S.W.2d 771 (Tex.Civ.App.—Tyler 1977, no writ); *Pargas of Longview, Inc. v. Jones,* 573 S.W.2d 571 (Tex.Civ.App.—Texarkana 1978, no writ); *Williams v. Garnett,* 608 S.W.2d 794 (Tex.Civ.App.—Waco 1980, no writ). See also *Neely v. Community Properties, Inc.,* 639 S.W.2d 452, 25 Tex. Sup.Ct.J. 453 (1982).

In connection with the above point, HL & P argues that the amount of the (exemplary) damages award is excessive, and therefore, a remittitur should be required.

■■■■ There are several facts which we consider in determining whether the award of exemplary damages is reasonable: 1) the nature of the wrong; 2) the character of the conduct involved; 3) the degree of culpability of the wrongdoer; 4) the situation and sensibilities of the parties concerned; and 5) the extent to which such conduct offends a public sense of justice and propriety. *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981). While the relationship between actual and exemplary damages should be proportional, there is no set rule or ratio which will be considered reasonable. Instead, the determination must depend on the facts of each particular case. In the present case, not only was there evidence to support an award of exemplary damages, but we find that such

award is not so large as to indicate passion, prejudice, corruption or disregard of the evidence. *Alamo National Bank,* supra; *Prudential Corporation v. Bazaman,* 512 S.W.2d 85 (Tex.Civ.App.—Corpus Christi 1974, no writ). The award is not so excessive as to shock the sense of justice and the conscience of this Court. See *Armellini Express Lines of Florida v. Ansley,* 605 S.W.2d 297, 310 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.). Accordingly, appellant's second and third points of error are overruled.

Appellant contends in point of error four that the trial court erred in admitting into evidence the settlement agreement between appellee and appellant regarding appellee's claim for injunctive relief because it was irrelevant, collateral and highly prejudicial to appellant. The introduction of the settlement agreement which appellant is complaining of arose during cross-examination of Mr. Thornton. It reads as follows:

"Q: So when Charlie called you you told him all you could do to help him would be to call Ebasco, is that right, told him nothing else?

A: Right.

Q: You are testifying you didn't have any authority to work out any kind of agreement with him or anything like that, is that your testimony?

A: Yes, sir.

Q: Are you absolutely sure of that testimony, Mr. Thornton?

A: Yes, I am."

\* \* \* \* \* \*

Q: That is your signature?

A: Yes, sir.

Q: Would you look at that exhibit and tell me what that exhibit is, please, sir?

A: (Examining)

Q: Do you recognize that exhibit?

A: Yes, sir.

Q: Will you tell the jury what it is?

A: It is a letter wherein I agreed in behalf of Houston Lighting & Power Company to do—

Appellant offered this exhibit and it was admitted for the limited purpose of impeaching the testimony of Mr. Thornton since he had denied that he had authority from HL & P to settle any problem with Mr. Sue. Appellant objected to it on the basis that it was a settlement agreement, and if it was impeachable material, it was on a collateral matter and was therefore inadmissible.

■■■■ Texas adheres to the rule that information concerning settlement agreements should be excluded from the jury because the agreement could be taken as an admission of liability. *City of Houston v. Sam P. Wallace and Co.,* 585 S.W.2d 669 (Tex.1979). However, in the present case, the testimony was allowed strictly for impeachment purposes. We hold that, for its limited purpose of impeachment, the agreement was admissible.

■■■■ Appellant alternatively contends that, even if the agreement were admissible for impeachment purposes, it should have been inadmissible in this case because it related solely to a collateral matter. Even so, impeachment evidence on collateral matters which affect the credibility of a witness or a party are clearly admissible. *Royal v. Cameron,* 382 S.W.2d 335 (Tex.Civ.App.—Tyler 1964, writ ref'd n.r.e.). Furthermore, the rule of admissibility of evidence of this nature should be liberal, and the trial court should have the discretion to receive any evidence which gives promise of exposing falsehood. *Royal v. Cameron,* supra; R. Ray, Texas Law of Evidence, § 685 (3rd Ed.1980). In the present case, Thornton's testimony that he had no authority to enter into any agreements was clearly contrary to the agreement which he was authorized to make with appellee. Appellant's fourth point of error is overruled.

Point of error five complains that the trial court erred in entering judgment against HL & P on the basis of trespass because, as a matter of law, HL & P committed no trespass on the 377-acre tract inasmuch as, at most, it merely gave Ebasco permission to enter on the land. HL & P argues that the actual entry upon the land was made by Ebasco and not by HL & P.

■■■■ We find the Restatement (Second) of Torts § 158 comment j to be dispositive of this issue. It states:

*"Causing entry of a third person.* If, by any act of his, the actor intentionally causes a third person to enter land, he is as fully liable as though he himself enters. Thus, if the actor has commanded or requested a third person to enter land in the possession of another, the actor is responsible for the third person's entry, if it be a trespass. This is an application of the general principle that one who intentionally causes another to do an act is under the same liability as though he himself does the act in question."

See also: *Parker v. Kangera,* 482 S.W.2d 43 (Tex.Civ.App.—Tyler 1972, writ ref'd n.r.e.). In the present case, it is undisputed that Ebasco was on the land at the request of HL & P. Accordingly, the fifth point of error is overruled.

In its final point of error, HL & P argues that the trial court erred in entering judgment against HL & P on the basis of negligence because it is not liable under the doctrine of respondeat superior for any negligence which may be committed by the construction workers. HL & P contends that there is either no evidence or insufficient evidence that HL & P directed and controlled the details of Ebasco's work and that a jury finding to that effect is against the great weight and preponderance of the evidence. We disagree. We review this point of error under the same evidentiary guidelines set forth above. We find that there is ample evidence in the record from which the jury could have found that HL & P controlled the work being done on the land in question. Several of the construction workers with Ebasco were paid by HL & P. The person in charge, Mr. Coonrod, was an HL & P employee and the general foreman of the dirt job at the Cedar Bayou Plant. He testified that HL & P told him to build the road which resulted in the trespass and damages. While Ebasco was the actual contractor who gave orders on

what was to be done and how it was to be done, HL & P paid the Ebasco construction workers, and all of the equipment used on the job was purchased by HL & P. There is evidence in the record that, while Mr. Coonrod was technically only head foreman over the operators, practically speaking, he served as foreman over the entire operation in the final stages.

 Findings of fact made by the trier of facts will be sustained if there is some evidence of probative force to support them and they are not against the great weight and preponderance of the evidence. *State v. Zaruba,* 418 S.W.2d 499 (Tex.1967); *Loeb, Rhodes & Co. v. Stanley,* 541 S.W.2d 869 (Tex.Civ.App.—Corpus Christi 1976, no writ). Furthermore, a court of appeals cannot substitute its judgment for that of the trier of fact, even though after reviewing the evidence, it might have reached a different conclusion from that of the jury. *Loeb, Rhodes & Co. v. Stanley,* supra.

 In the case at bar, there is conflicting evidence with regard to who was in control of the construction workers. However, there is probative evidence that HL & P signed the paychecks, furnished the equipment, and that Mr. Coonrod, an HL & P employee, supervised the workers. We, therefore, hold that there is evidence to support the findings of fact and that such evidence is not against the great weight and preponderance of the evidence. We have considered all the points of error, and they are overruled.

The judgment of the trial court is AFFIRMED.